NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
KAREN I. MEYER (Cal. Bar No. 220554)
Assistant United States Attorney
Violent and Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8559
     Facsimile: (213) 894-3713
     E-mail:    kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>             v.<br><br>GABRIEL GONZALEZ,<br><br>             Defendant. | No. CR 04-1189(A)-CAS<br><br>DECLARATIONS OF DR. TANISHA HALL FILED IN SUPPORT OF UNITED STATES' OPPOSITION TO DEFENDANT'S UNEXHAUSTED MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Karen I. Meyer,

hereby files the declarations of Dr. Tanisha Hall in support of the

United States' Opposition to Defendant's Unexhausted Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(C)(1)(A).


Dated: June 24, 2020                   Respectfully submitted,

                                       NICOLA T. HANNA
                                       United States Attorney

                                       BRANDON D. FOX
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                       _____/s/_____
                                       KAREN I. MEYER
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

On May 20, 2020, the government filed its opposition to defendant's motion for compassionate release (CR 206).  Included in that opposition was government counsel's declaration in which government counsel quoted at length from a declaration from Dr. Tanisha Hall, Associate Warden at FCC-Forrest City, Arkansas, filed in another case.

On June 4, 2020, defendant filed a motion seeking production of the Hall declaration in that other case (CR 209).  On June 22, 2020, this Court granted defendant's motion, ordering the government to file the declaration with the Court and provide it to defendant by July 2, 2020.

Pursuant to the Court's order, the government is filing two declarations from Dr. Hall that were filed in two separate cases. While virtually identical, the government quoted from the Hall declaration filed in <u>United States v. Earnest Gibson IV</u>, CR 12-600 (S.D. Texas), because the version filed in the South Carolina case (<u>United States v. Marcus Gibbs</u>, CR 10-1104 (D. South Carolina)), appeared to be more in draft form.  The government is filing both versions with the Court, and is providing both versions to defendant. The government has redacted from the Texas declaration personal identifying information of the inmate in that case.

1   NICOLA T. HANNA
    United States Attorney
2   BRANDON D. FOX
    Assistant United States Attorney
3   Chief, Criminal Division
    KAREN I. MEYER (Cal. Bar No. 220554)
4   Assistant United States Attorney
    Violent and Organized Crime Section
5        1300 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone: (213) 894-8559
7        Facsimile: (213) 894-3713
         E-mail:    kim.meyer@usdoj.gov
8
9   Attorneys for Plaintiff
    UNITED STATES OF AMERICA
10
11                  UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,          No. CR 04-1189(A)-CAS

14            Plaintiff,               DECLARATIONS OF DR. TANISHA
                                       HALL FILED IN SUPPORT OF UNITED
15            v.                       STATES' OPPOSITION TO DEFENDANT'S
                                       UNEXHAUSTED MOTION TO REDUCE
16  GABRIEL GONZALEZ,                  SENTENCE PURSUANT TO 18 U.S.C.
                                       § 3582(C)(1)(A)
17            Defendant.

18

19

20       Plaintiff United States of America, by and through its counsel

21  of record, the United States Attorney for the Central District of

22  California and Assistant United States Attorney Karen I. Meyer,

23  hereby files the declarations of Dr. Tanisha Hall in support of the

24

25

26

27

28

1  United States' Opposition to Defendant's Unexhausted Motion to Reduce

2  Sentence Pursuant to 18 U.S.C. § 3582(C)(1)(A).

3

4   Dated: June 23, 2020              Respectfully submitted,

5                                     NICOLA T. HANNA
                                      United States Attorney
6
                                      BRANDON D. FOX
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                     _____/s/_____
                                      KAREN I. MEYER
10                                    Assistant United States Attorney

11                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

On May 20, 2020, the government filed its opposition to defendant's motion for compassionate release (CR 206).  Included in that opposition was government counsel's declaration in which government counsel quoted at length from a declaration from Dr. Tanisha Hall, Associate Warden at FCC-Forrest City, Arkansas, filed in another case.

On June 4, 2020, defendant filed a motion seeking production of the Hall declaration in that other case (CR 209).  On June 22, 2020, this Court granted defendant's motion, ordering the government to file the declaration with the Court and provide it to defendant by July 2, 2020.

Pursuant to the Court's order, the government is filing two declarations from Dr. Hall that were filed in two separate cases. While virtually identical, the government quoted from the Hall declaration filed in <u>United States v. Earnest Gibson IV</u>, CR 12-600 (S.D. Texas), because the version filed in the South Carolina case (<u>United States v. Marcus Gibbs</u>, CR 10-1104 (D. South Carolina)), appeared to be more in draft form.  The government is filing both versions with the Court, and is providing both versions to defendant. The government has redacted from the Texas declaration personal identifying information of the inmate in that case.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA,

v.

EARNEST GIBSON IV,

Defendant.

No. 4:12-CR-00600-002

**DECLARATION OF**
**DR. TANISHA HALL**

I, Dr. Tanisha Hall, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

## I. Personal Background

1. I am currently employed by the Federal Bureau of Prisons (BOP) of the United States Department of Justice, as an Associate Warden, at FCC Forrest City.

2. I started my career with the Bureau of Prisons as a Correctional Officer at FPC Bryan in September 1994. In November 1995, I promoted to Correctional Systems Officer at FPC Bryan, and Drug Treatment Specialist in December 1997. In September 1999, I promoted to Case Manager at FPC Bryan, where I remained until my selection as Reentry Affairs Coordinator at FDC Houston in July 2012. In September 2014, I promoted to Unit Manager at FCI Bastrop, and Executive Assistant and Camp Administrator at FCC Pollock in July 2016, where I remained until my selection as Associate Warden at FCC Forrest City in December 2018.

## II. The BOP's Authority to Place Inmates on Home Confinement

3. The BOP's statutory authority to transfer prisoners to home confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. The BOP's policy and procedures regarding home confinement are outlined in BOP Program Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home Confinement under the First Step Act*, both of which are available on www.bop.gov via the Resources tab. Both statutes set forth certain limitations with respect to the BOP's transfer authority. *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. However, pursuant to the Attorney General's directives in light of the COVID-19 pandemic, dated March 26, 2020, and April 3, 2020, *infra*, and given the surge in positive cases at select sites, the BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention (CDC), to determine which inmates are suitable for home confinement.

Since the release of the Attorney General's original memorandum dated March 26, 2020, the BOP is prioritizing transfers to home confinement of all suitable inmates as an appropriate response to the COVID-19 pandemic.

### III.   The Attorney General's Memorandum for the Director of the Bureau of Prisons, dated March 26, 2020

4.      On March 26, 2020, the Attorney General issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020 Memorandum) to ensure that, in light of the COVID-19 pandemic, BOP utilizes home confinement, where appropriate, to protect the health and safety of BOP personnel and people in BOP's custody.  Pursuant to the March 26, 2020 Memorandum, BOP is prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.  It was noted in the March 26, 2020 Memorandum that many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.  But for some eligible inmates, home confinement might be more effective in protecting their health.

5.      In assessing whether home confinement should be granted pursuant to the March 26, 2020 Memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

    a.  The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

    b.  The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

    c.  The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

d.  The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need),[1] with inmates who have anything above a minimum score not receiving priority treatment;

e.  Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

f.  The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex offenses, will render an inmate ineligible for home confinement.  Other serious offenses weigh heavily against consideration for home confinement.

6.  In addition to setting forth these factors, the March 26, 2020 Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement.  The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.  The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

7.  Moreover, the March 26, 2020 Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a

---

[1] For more information on PATTERN, please visit www.bop.gov via Inmates/ First Step Act tab.

Declaration of Dr. Hall | 3

BOP facility to home confinement.  Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

## IV.   The CARES Act and the Attorney General's Memorandum for the Director of the Bureau of Prisons, dated April 3, 2020

8.   The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the Bureau of Prisons (April 3, 2020 Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determines that COVID-19 is materially affecting operations.

9.   The April 3, 2020 Memorandum specifically stated that the BOP must move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the BOP continues to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.

10.   The April 3, 2020 Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems.  The April 3, 2020 Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.

11.     For inmates deemed suitable candidates for home confinement, the April 3, 2020 Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility.  The April 3, 2020 Memorandum further authorized BOP to, in appropriate cases, require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate is being transferred rather than in the BOP facility from which the inmate is being transferred.  The assessment of all inmates remains guided by the factors in the March 26, 2020 Memorandum.

12.     The April 3, 2020 Memorandum also recognized that the BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

13.     Lastly, the April 3, 2020 Memorandum stated that it is essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

## V.   The BOP's Implementation of the March 26, 2020 and the April 3, 2020 Memoranda

14.     The BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country.  The BOP is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program.   The BOP is then processing those inmates for transfer as expeditiously as possible.

15.     The BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives.

16.     The BOP has increased home confinement by over 65.6% since March 2020, and is continuing to aggressively screen inmates for home confinement. Since the March 26, 2020 Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 1,871 inmates on home confinement.  *See* www.bop.gov.

17.     Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

18.     It should be noted that for public safety reasons, in accordance with the March 26, 2020 Memorandum, and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

19.     In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences.  While these priority factors are subject to deviation in

BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences.  As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration.

20.   If the incarcerated individual does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies.

## VI.   Measures to Protect Inmate and Staff Safety

21.   In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.  These steps include, but are not limited to the following:

    a.  Beginning April 13, 2020, BOP implemented Phase 6 of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions.

    b.  All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face

covering when in public areas when social distancing cannot be achieved.

c.   All newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms, placed in quarantine for a full fourteen days, and have their temperature taken daily.   Any inmates displaying symptoms are placed in isolation and tested for the COVID19 virus and kept in isolation and treated until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.   Asymptomatic inmates who were at risk of exposure to COVID-19 are also quarantined and tested daily.

d.   In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

e.   Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

f.   Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a

case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

g.  Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

## VII.  Earnest Gibson █████████/FCI Forrest City Low

22.   Defendant is a ██ year old male, serving an aggregated 241 month sentence, with a 3 year term of supervised release, for his convictions on Conspiracy to Commit Health Fraud, Conspiracy to Defraud the U.S., Offering or Paying Health Care Kickbacks, Aiding and Abetting, and Conspiracy to Commit Money Laundering. ██████████████████████████████████████████████████ ████████████████████ and was subsequently convicted in the Eastern District of Arkansas for Possession of a Prohibited Object by a Prison Inmate (Cellphone), for which he received a one month sentence consecutive to the sentence he was already serving.

23.   Defendant has a projected release date of ██████████████████ ██████████████. He is classified as a ████████████████████ inmate. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████

24.   FCI Forrest City Low is in compliance with BOP protocols and CDC guidance regarding procedures to combat the COVID-19 pandemic outlined in the attachments.

25.   The institution is on modified operations and inmates are not permitted to go to Recreation, Education, or Food Service.  Att. 1.  The inmate's meals are delivered to the housing units, and any movements are controlled by one pod at a

time in order to avoid cross contamination.  Inmates are strongly advised to keep social distancing.  However, they do receive their commissary and are allowed to spend $150.00 every other week.

26.    The staff are required to wear PPE equipment daily in order to protect themselves from contracting the virus.  In isolation areas they are in full PPE (gown, goggles, mask, gloves), and in areas that are not affected by the virus they are required to wear a mask and gloves.

27.    Each inmate has been issued three cloth masks to wear and are issued a hygiene kit each week with hand sanitizer, two additional bars of soap, razors and toothpaste.  Att. 2.  Additionally, FCC Forrest City has foam soap on the wall for the inmates to use that is filled up throughout the day and in the evening.  Families have never been able to mail in items to inmates under BOP policy, and this rule is even more important now to avoid cross-contamination.

28.    The Safety department provides bleach to all housing units every morning and the counselor sprays down every bathroom continuously throughout the day and the HALT chemical which is used daily to saturate the inmates cells and cubicles to kill the virus, and the inmate orderlies walk around continuously saturating the highly used areas such as computer tables, phones, and wiping down computer keys.  The Laundry staff have a schedule where they come to the units daily to pick up the inmate's clothes to wash them at a 130 degrees temperature water to kill the virus.  The administration is constantly putting out information to the inmate population to educate them on the virus.  Currently, the CDC is here conducting a study and testing inmates for the virus, Att. 3, but many are refusing to test.  However, those who have tested are properly being cared for and isolated from those inmates that test negative.

29.    FCC Forrest City is testing the pods that have the most positive cases, and is isolating those inmates in the vocational area, which is set up like a hospital.

Declaration of Dr. Hall | 10

Inmates waiting test results are isolated in the Chapel area pending results. Inmates who test negative are housed in the Education area. Inmates in recovery are in the Visiting Room and Recreation areas. All of these areas have televisions for the inmates to watch and they receive a phone call three times per week.

30.     The inmates in isolation (see ¶ 21.c above), those waiting test results and those in recovery see the nursing staff daily. Because of the outstanding job of the Health Services department FCC Forrest City currently has ninety-seven inmates who have fully recovered from this virus, and no inmate deaths.

31.     The CDC is on the compound testing inmates for the COVID19 virus in an effort to assist the FCC Forrest City in identifying those highly affected areas in the institution in effort to stop the spread of the virus by identifying and separating those inmates infected with the virus. The CDC will be at FCC Forrest City for two weeks or it could be longer, depending on the time it takes them to complete their data collection.

## VIII.    Compassionate Release / Reduction in Sentence Procedures

32.     The BOP lacks the authority to provide inmates with a reduction in sentence through compassionate or "early release." Rather, only an Article III judge—specifically, the inmate's sentencing judge—may authorize such a reduction of an inmate's federal sentence. However, on an inmate's request, the Director of the BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A). The BOP uses these statutory authorities in "extraordinary or compelling circumstances" which could not reasonably have been foreseen by the court at the time of sentencing. This process is outlined in BOP Program Statement 5050.50, *Compassionate Release / Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g).* (This BOP program statement is available at www.bop.gov via the Resources tab).

33.     Additionally, the First Step Act specifies that an inmate may file a Motion for Reduction of Sentence directly in the sentencing court after exhaustion of administrative remedies, or 30 days from the date the warden receives such a request from the inmate, whichever is earlier.  *See* 18 U.S.C. § 3582(c)(1)(A).


Executed on this ____ day of _____, 2020.


_____

Dr. Tanisha Hall
Associate Warden
Federal Bureau of Prisons
FCC Forrest City

1

2 **UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
3

4 UNITED STATES OF AMERICA,          No. 2:10-CR-1104

5              v.

6 MARCUS GIBBS,                       **DECLARATION OF**
**DR. TANISHA HALL**
7              Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Dr. Tanisha Hall, declare the following under 28 U.S.C. § 1746, and state that
2    under penalty of perjury the following is true and correct to the best of my knowledge
3    and belief:

4    **I.      Personal Background**

5        1.      I am currently employed by the Federal Bureau of Prisons (BOP) of the
6    United States Department of Justice, as an Associate Warden, at FCC Forrest City.

7        2.      I started my career with the Bureau of Prisons as a Correctional Officer
8    at FPC Bryan in September 1994.  In November 1995, I promoted to Correctional
9    Systems Officer at FPC Bryan, and Drug Treatment Specialist in December 1997.  In
10   September 1999, I promoted to Case Manager at FPC Bryan, where I remained until
11   my selection as Reentry Affairs Coordinator at FDC Houston in July 2012.  In
12   September 2014, I promoted to Unit Manager at FCI Bastrop, and Executive
13   Assistant and Camp Administrator at FCC Pollock in July 2016, where I remained
14   until my selection as Associate Warden at FCC Forrest City in December 2018.

15   **II.     The BOP's Authority to Place Inmates on Home Confinement**

16       3.      The BOP's statutory authority to transfer prisoners to home
17   confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.  The BOP's policy
18   and procedures regarding home confinement are outlined in BOP Program
19   Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home
20   Confinement under the First Step Act*, both of which are available on www.bop.gov via
21   the Resources tab.  Both statutes set forth certain limitations with respect to the
22   BOP's transfer authority.  *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541.
23   However, pursuant to the Attorney General's directives in light of the COVID-19
24   pandemic, dated March 26, 2020, and April 3, 2020, *infra*, and given the surge in
25   positive cases at select sites, the BOP began immediately reviewing all inmates who
26   have COVID-19 risk factors, as described by the Centers for Disease Control and
27   Prevention (CDC), to determine which inmates are suitable for home confinement.

28

Since the release of the Attorney General's original memorandum dated March 26, 2020, the BOP is prioritizing transfers to home confinement of all suitable inmates as an appropriate response to the COVID-19 pandemic.

### III. The Attorney General's Memorandum for the Director of the Bureau of Prisons, dated March 26, 2020

4.      On March 26, 2020, the Attorney General issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020 Memorandum) to ensure that, in light of the COVID-19 pandemic, BOP utilizes home confinement, where appropriate, to protect the health and safety of BOP personnel and people in BOP's custody.  Pursuant to the March 26, 2020 Memorandum, BOP is prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.  It was noted in the March 26, 2020 Memorandum that many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.  But for some eligible inmates, home confinement might be more effective in protecting their health.

5.      In assessing whether home confinement should be granted pursuant to the March 26, 2020 Memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

   a. The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

   b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

   c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

Declaration of Dr. Hall | 2

d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need),[1] with inmates who have anything above a minimum score not receiving priority treatment;

e. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

f. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex offenses, will render an inmate ineligible for home confinement.  Other serious offenses weigh heavily against consideration for home confinement.

6.     In addition to setting forth these factors, the March 26, 2020 Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement. The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.  The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

7.     Moreover, the March 26, 2020 Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a

---

[1] For more information on PATTERN, please visit www.bop.gov via Inmates/ First Step Act tab.

Declaration of Dr. Hall | 3

BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

**IV.    The CARES Act and the Attorney General's Memorandum for the Director of the Bureau of Prisons, dated April 3, 2020**

8.    The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the Bureau of Prisons (April 3, 2020 Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determines that COVID-19 is materially affecting operations.

9.    The April 3, 2020 Memorandum specifically stated that the BOP must move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the BOP continues to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.

10.    The April 3, 2020 Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020 Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.

11.     For inmates deemed suitable candidates for home confinement, the April 3, 2020 Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility.  The April 3, 2020 Memorandum further authorized BOP to, in appropriate cases, require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate is being transferred rather than in the BOP facility from which the inmate is being transferred.  The assessment of all inmates remains guided by the factors in the March 26, 2020 Memorandum.

12.     The April 3, 2020 Memorandum also recognized that the BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

13.     Lastly, the April 3, 2020 Memorandum stated that it is essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

**V.   The BOP's Implementation of the March 26, 2020 and the April 3, 2020 Memoranda**

14.     The BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country.  The BOP is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program.   The BOP is then processing those inmates for transfer as expeditiously as possible.

15.     The BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives.

16.     The BOP has increased home confinement by over 65.6% since March 2020, and is continuing to aggressively screen inmates for home confinement. Since the March 26, 2020 Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 1,871 inmates on home confinement. *See* www.bop.gov.

17.     Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

18.     It should be noted that for public safety reasons, in accordance with the March 26, 2020 Memorandum, and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

19.     In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences. While these priority factors are subject to deviation in

1   BOP's discretion in certain circumstances and are subject to revision as the situation
2   progresses, BOP is at this time prioritizing for consideration those inmates who
3   either (1) have served 50% or more of their sentences, or (2) have 18 months or less
4   remaining in their sentences and have served 25% or more of their sentences. As
5   BOP processes the inmates eligible for home confinement under these criteria and
6   learns more about the COVID-19 pandemic and its effect on BOP facilities, it is
7   assessing whether and how to otherwise prioritize consideration.

8        20.     If the incarcerated individual does not qualify for home confinement
9   under BOP criteria, an inmate may be reviewed for placement in a Residential
10  Reentry Center and home confinement at a later stage in accordance with applicable
11  laws and BOP policies.

12  **VI.   Measures to Protect Inmate and Staff Safety**

13       21.     In response to the pandemic, BOP has taken significant measures to
14  protect the health of the inmates in its charge. These steps include, but are not
15  limited to the following:

16       a.   Beginning April 13, 2020, BOP implemented Phase 6 of the Action Plan,
17            which currently governs operations. The current modified operations
18            plan requires that all inmates in every BOP institution be secured in their
19            assigned cells/quarters for a period of at least 14 days, in order to stop
20            any spread of the disease. Only limited group gathering is afforded, with
21            attention to social distancing to the extent possible, to facilitate
22            commissary, laundry, showers, telephone, and computer access. Further,
23            BOP has severely limited the movement of inmates and detainees
24            among its facilities. Though there will be exceptions for medical
25            treatment and similar exigencies, this step as well will limit transmissions.
26       b.   All staff and inmates have been and will continue to be issued an
27            appropriate face covering and strongly encouraged to wear the face
28

covering when in public areas when social distancing cannot be achieved.

c. Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Newly admitted asymptomatic inmates with risk of exposure are placed in quarantine and are tested daily. Newly admitted symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

d. Inmates who are already incarcerated and who begin to show symptoms [are put into isolation and tested. If they test positive, they are treated and kept in isolation until they have recovered and are testing negative. Inmates who had exposure to [symptomatic inmates/inmates who test positive] are screened daily for symptoms and tested]. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

e. Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

f. Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that

Declaration of Dr. Hall | 8

familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

g. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

## VII.  FCI Forrest City Low

22.      FCI Forrest City Low is in compliance with BOP protocols and CDC guidance regarding procedures to combat the COVID-19 pandemic outlined in the attachments.

23.      The institution is on modified operations and inmates are not permitted to go to Recreation, Education, or Food Service.  Att. 1.  The inmate's meals are delivered to the housing units, and any movements are controlled by one pod at a time in order to avoid cross contamination.  Inmates are strongly advised to keep social distancing.  [However, they do receive their commissary and are allowed to spend $150.00 every three weeks due to social distancing and the number of inmates allowed at the Commissary at one time.  Additionally, the commissary is also working to ensure the store has adequate stock which ensures all inmates have the opportunity to purchase the same items without running out.]

24.      The staff are required to wear PPE equipment daily in order to protect themselves from contracting the virus.  In isolation areas they are in full PPE (gown, goggles, mask, gloves), and in areas that are not affected by the virus they are required to wear a mask and gloves.

25.     Each inmate has been issued three cloth masks to wear and are issued a hygiene kit each week with hand sanitizer, two additional bars of soap, razors and toothpaste. Att. 2. Additionally, FCC Forrest City has foam soap on the wall for the inmates to use that is filled up throughout the day and in the evening. Families have never been able to mail in items to inmates under BOP policy, and this rule is even more important now to avoid cross-contamination.

26.     The Safety department provides bleach to all housing units every morning and the counselor sprays down every bathroom continuously throughout the day and the HALT chemical which is used daily to saturate the inmates cells and cubicles to kill the virus, and the inmate orderlies walk around continuously saturating the highly used areas such as computer tables, phones, and wiping down computer keys. The Laundry staff have a schedule where they come to the units daily to pick up the inmate's clothes to wash them at a 150 degrees temperature water to kill the virus. [Is the laundry policy daily or weekly?] The administration is constantly putting out information to the inmate population to educate them on the virus. Currently, the CDC is here conducting a study and testing inmates for the virus, Att. 3, but many are refusing to test. However, those who have tested are properly being cared for and isolated from those inmates that test negative.

27.     FCC Forrest City is testing the pods that have the most positive cases, and is isolating those inmates in the vocational area, which is set up like a hospital. Inmates waiting test results are isolated in the Chapel area pending results. Inmates who test negative are housed in the Education area. Inmates in recovery are in the Visiting Room and Recreation areas. All of these areas have televisions for the inmates to watch and they receive a phone call three times per week.

28.     The inmates in isolation (see ¶ 21.c above), those waiting test results and those in recovery see the nursing staff daily. Because of the outstanding job of the

1  Health Services department, Forrest City FCI Low currently has 110 inmates who
2  have fully recovered from this virus, and no inmate deaths.

3      29.     The CDC is on the compound testing inmates for the COVID19 virus
4  in an effort to assist the FCC Forrest City in identifying those highly affected areas in
5  the institution in effort to stop the spread of the virus by identifying and separating
6  those inmates infected with the virus.  The CDC will be at FCC Forrest City for at
7  least another two weeks as FCC Forrest City is testing all the inmates at the Low
8  Component , it depends on the time it takes them to complete their data collection.

9  **VIII.    Compassionate Release / Reduction in Sentence Procedures**

10     30.     The BOP lacks the authority to provide inmates with a reduction in
11 sentence through compassionate or "early release."   Rather, only an Article III
12 judge—specifically, the inmate's sentencing judge—may authorize such  a reduction
13 of an inmate's federal sentence.  However, on an inmate's request, the Director of the
14 BOP may make a motion to an inmate's sentencing court to reduce a term of
15 imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A).  The BOP
16 uses these statutory authorities in "extraordinary or compelling circumstances" which
17 could not reasonably have been foreseen by the court at the time of sentencing.  This
18 process is outlined in BOP Program Statement 5050.50, *Compassionate Release/Reduction*
19 *In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*.  (This BOP
20 program statement is available at www.bop.gov via the Resources tab).

21
22
23
24
25
26
27
28

Declaration of Dr. Hall| 11

31.     Additionally, the First Step Act specifies that an inmate may file a Motion for Reduction of Sentence directly in the sentencing court after exhaustion of administrative remedies, or 30 days from the date the warden receives such a request from the inmate, whichever is earlier.  *See* 18 U.S.C. § 3582(c)(1)(A).


Executed on this 12ᵗʰ day of May , 2020.

Dr. Tanisha Hall
Associate Warden
Federal Bureau of Prisons
FCC Forrest City