

FILED
CLERK, U.S. DISTRICT COURT

July 13, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY:        CMJ        DEPUTY

UNITED STATES DISTRICT COURT
CENTTRAL DISTRICT OF CALIFORNIA

United States of America
Plaintiff

Case Number:  CR-04-1189-CAS

v.

Gabriel Gonzalez
Defendant, Pro Se

## REPLY TO GOVERNMENT'S RESPONSE

Gabriel Gonzalez tenders this motion to address several points and claims raised by the government in opposition to his motion seeking compassionate release (RIS)/or an alternate form of relief by this court, from the Coronavirus at his place of confinement.

## I.  a.  Gonzalez has exhausted his notice requirement to the prison's Warden.

In the government's motion, it is stated that Gonzalez has filed his compassionate release notification with the prison's Warden, thus making this issue ripe for review by the court. Gonzalez also provides a copy of his formal grievance which was submitted in paper form and in addition to the electronic notification of 4/07/20. (Exhibit 1, page 1). Gonzalez, out of an abundance of caution, also filed an updated petition with the Warden on 5/29/20 which includes

1

new facts not previously available, but which are pertinent to the matter at issue.  (Exhibit 1, pages 2-3).

### b. Gonzalez is not a danger to any specific person or to the community.

The government urges the court to find Gonzalez a danger and to deny his motion.  In its opposition motion, it has provided this court with points to consider which appear in Gonzalez' PSR.  In doing so it has opened the door for rebuttal which necessitates address of those claims. Gonzalez does not mean to relitigate this case here but strives to maintain good-faith provisional notice in refutation of these points without digression from the true nature of his current petition for compassionate release.

Gonzalez maintains his innocence for the crimes of which he stands convicted.  It is with this assuredness that he chose to stand trial and to decline the government's plea offer.  His time in prison, in fact, would have already been completed had he accepted their offer but, such acceptance would have been perjurious upon this court.  The government now seeks to declare Gonzalez a danger to the public when it was all too ready to grant him release at this very period in time when his collaboration served to benefit their interests, but not if he exercised his constitutional right to trial.  There can be few greater examples of equivocation than the government's previous offer of freedom and their position now in opposition of freedom-the only difference being Gonzalez' exercise of his defense by trial.

Several times, the courts and the government have questioned the inexplicable reason or cause for this seemingly well-educated professional (Gonzalez) to have gone astray.  But the

facts and evidence below offer an exposition into the realities previously hidden from this court's inspection.

Sheriff Leroy Baca, Undersheriff Tanaka, and scores of other LASD  sworn staff now serve federal prison sentences for their participation in obstructing justice and lying to the Federal Bureau of Investigation, including threatening harm to an FBI agent, at her home, when they appeared at her doorstep and demanded she terminate her investigation into civil rights complaints within the LASD.  It is clear that Baca, et alia, who have controlled the dissemination of information related to criminal activity within the Department, have always done so with an objective to benefit him and his administration.  For example, consider the many safeguards in place to protect LASD deputies from false accusations.  Each patrol vehicle is equipped with an in-car video system, all custody facilities are furnished with video and audio security systems and interviewing of suspects and witnesses are generally recorded via tape-recorder or other such device.

All of these devices were used by Gonzalez, but when demanded as part of discovery- were declared to have been 'lost or destroyed' by LASD record custodians.  But this was false and some of these important records have been recovered, over the years, which exculpate important parts of the original criminal presentations.  One such example is the Century Regional Detention Facility (CRDF) video which shows Gonzalez inside the jail facility during the time the government contends he is in a patrol car in the government's Kraco-alley tape.  But even the Kraco tape shows no such criminal activity, only a speculation that the time the car was in the alley was enough time to commit the alleged assault.  (See Fields count).  But despite the exonerative CRDF tape, the damage had been done because Fields was allowed to testify to the assault she claims to have endured in that alley.  What was kept from the court was that Fields'

original complaint to investigators showed the alleged incident took place at 2030 hrs., not at the

0020 hrs. on the Kraco Tape, which showed several dates and times on its video output yet

visually showed no such assault at either time.  Perhaps this discrepancy takes on greater

meaning when State court records show Fields was paid in exchange for her cooperation with the

government to provide false testimony against Gonzalez.  This payment was also undivulged to

Gonzalez prior to trial but was discovered well after.  (See exhibit 2).

Shortly after requesting these records, persons unknown persuaded the State court to

order these records be destroyed.  (Exhibit 2, page 13).

Or consider the fact that in the subsequent civil suit against the County of Los Angeles,

that Dolores Tirado (the sister of C. Tirado) told Manning and Marder investigative legal counsel

that she had been threatened to keep her mouth shut when asked about Cecilia Tirado's claim

against the County.  (Tirado count).  It seems Dolores had already advised Manning and

Marder's John Ramirez, Esq. that Cecilia had lied about being assaulted by Gonzalez but instead

had bragged about making a deal with a South Gate Officer to get out of a ticket.  In fact, Cecilia

Tirado, in her taped interview, told investigators that the South Gate Officer was a dark-skinned

black male whom she saw working during the daytime in front of her South Gate Beauty shop.

Dolores told John Ramirez and Trevor Grimm (also of Manning and Marder) that she feared loss

of her job and livelihood if she spoke against her sister "Cessy" (Cecilia Tirado) since she

worked for her at the beauty shop.

But the government hopes to include details from an uncharged count involving Antonia

Ramirez.  The Ramirez count was dropped by the government "in the interests of justice" prior to

trial.  LASD interviewers captured Ramirez on audio tape confessing that she "made up" the

allegation against Gonzalez because it was "all [she] could think of" to stop her from being

beaten by her husband during a domestic dispute.  This tape remains with investigators and was not provided for discovery but is now vital to refute the government's assertions.  Trial counsel Podberesky and Hirsch told Gonzalez that the County, under direction from Baca, agreed to pay Ramirez a large sum in exchange for her cooperation and testimony but when the government dropped her count (Ramirez count) the County sought return of their payment but Ramirez refused.  The disclosure of this payment was not presented as part of discover but was discovered as part of a defense investigation by the Scully and Solerno Investigations Firm used by trial counsel.

Although there's more, further details may be best presented in another proceeding.  The video and court records demonstrating payment in exchange for cooperation and testimony irrefutably exist, but the government continues to deny any such knowledge of them.  Perhaps this is because they were the result of LASD efforts to conceal them, or by a desire to win the case at all costs.  But the government should have known of them, or at least now, has the duty and obligation to objectively examine these matters in furtherance of the verifiable truths presented here.

Gonzalez understands the seriousness and gravity of the allegations against him, just as he understood the innumerable other life-threatening dangers he accepted when he began his career with the State.  This litigation is not designed to release him from the debt demanded he owes by law, but is instead a means by which to extend his life so that someday he may litigate with further exonerative evidence, for he can have no emancipation to the mainstream until he proves his innocence and prosecutorial error under the investigative misconduct of LASD personnel, or both.  Truly, this is a nearly insurmountable task after all this time.

It is for this reason Gonzalez asks for an order authorizing a Special Master to review this information for the limited purpose of refuting the government's assertions here and demonstrating the prevalent witness tampering issues brought to light under the Baca Administration, et alia.  (See also 18 U.S.C. 201(c)(2); Yvette Singleton 144 just 1343 (10th Cir. 1998). Gonzalez has twice asked the State's Attorney General to prosecute this case against him under State law.  The goal in this request was to bring out these facts in the hopes of showing this exonerative evidence which could then be presented for Federal review.  The State refused his requests to be prosecuted by their office.

Gonzalez asks to be placed in custody under this court's custodianship, where he can be levied protective orders against contact with witnesses, while being monitored and maintained away from the deadly Coronavirus rampant in the prison and because the prison maintains a no-treatment regime for its prisoners who have been identified as infected by the virus. (Exhibit 6).

**II.  The delay in proactive preventative COVID-19 shielding by the Bureau of Prisons has had the ultimate critical, morbid impact upon this defendant.**

**(a). Gonzalez' pleading(s) to keep him safe and healthy come too late, as he has now been confirmed positive with the Coronavirus.  (Exhibit 3).**

In response to this finding, the prison has relocated Gonzalez to another housing unit on the same prison grounds (to the Wynne-D building), where he is confined with approximately 160 other prisoners who have been confirmed COVID-19 positive. This dorm is identical to his previous housing unit and is an open-dorm communal dormitory.

Gonzalez was given a Nasopharyngeal exam on 5/13/20. The test results were publicly broadcast, and he was ordered to move to his new location on 5/20/20, some 200 yards away to the next building. To date, Gonzalez has not received any examination, no pharmaceutical treatments, or any other medical care other than having his temperature checked once daily using an extra-dermal infrared thermometer. The once-daily routine is exactly 1/2 of the number of temperature checks Gonzalez received prior to being found positive for the virus. Over the counter medication (OTC) requests are routinely denied by medical staff, who direct prisoners to purchase them from the prison's commissary when allowed to shop. Shopping occurs generally once per month. (id. Exhibit 6).

**(b).  Having contracted the lethal COVID-19 virus, Gonzales is now eligible for RIS consideration under the 'Terminal Illness' categorical provision of the FIRST STEP ACT for Compassionate Release.**

Since there is no known cure for infection from COVID-19, and the fact that Gonzalez remains medically untreated by the prison, surely his prospect of recovery is grim. The COVID-19 virus is an infectious disease-causing severe pain and suffering in its host as the virus slowly deteriorates respiratory and organ functioning. The virus causes loss of brain function, confusion, shortness of breath, inability to eat or drink, and is often but not always marked by high fever and causes a drowning in one's own fluids as normal bodily functions begin to shut down. It has been described as a "particularly excruciating, painful death."

In consideration under this FSA provision there exists an obligation by the United States to respect the rights to life and to humane treatment of all human beings..."including for persons

suspected or convicted of even the most serious crimes." (International Covenant on Civil and

Political Rights (ICCPR) 12/16/66, entered into force 3/23/76, ratified by the United States in

1992, Arts. 6 and 10).

The United Nations Human Rights Committee, the independent expert body that

interprets the ICCPR, has stated the existence of;

> "[a] heightened duty of care to take any necessary measures to protect the lives of
> individuals deprived of their liberty by the State, since by arresting, detaining,
> imprisoning or otherwise depriving individuals of their liberty, States parties
> assume the responsibility to care for their lives and bodily integrity, and they may
> not rely on lack of financial resources or other logistical problems to reduce this
> responsibility...The duty to protect the life of all detained individuals includes
> providing them with the necessary medical care and appropriate regular
> monitoring of their health...which includes a requirement that States take
> appropriate measures to address the prevalence of life-threatening diseases."
> (United Nations Human Rights Committee, general comment no. 36, para 3.,
> ibid., para. 25 and 26).

Gonzalez asks for protection under this court's authority against the prison's forced

prisoner exposure to the virus, aggravated subjection, and lack of medical intervention for

Gonzalez' confirmed positive incurrence of COVID-19.  It must not be left to blind chance that

Gonzalez survive this crisis.

**(c). Gonzalez also qualifies for FSA consideration under the 'Serious Medical Condition' categorical provision.**

It is undeniable that contraction of the Coronavirus is a serious medical condition.  It is also undisputed that the prison-communal-environment amongst prisoners who are infected result in high-mortality.

Even if the government were to argue that Gonzalez' condition was asymptomatic, which it is not-but there are no prison medical records to show otherwise because the prison does not provide treatment, only quarantine, research shows a more menacing perspective.

Research shows, patients who initially present as asymptomatic should be thought of as pre-symptomatic, because their lung CAT scans (CT's) [often] demonstrate "ground glass opacities" and pneumonia-like presentations, with a majority of asymptomatic patients in some studies going on to develop full-blown COVID-19 symptoms.  In fact, some deaths have been recorded 34 weeks behind infections, thus showing exponentiating rates of death.  (Lin, M. (2020) How to Fight the Coronavirus SARS-COV-2 and its Disease); also Worldometers.info/coronavirus/.

To date, there are approximately 90 Federal prisoner deaths associated with Coronavirus contraction and over 1000 prisoners and staff at Gonzalez' prison who have contracted COVID-19.  The numbers only continue to rise.  This prison, FCI Forrest City, currently boasts the #1 top infected federal prison in the nation.  This ranking is likely due to the exacerbating 'viral loading' practices at FCI Forrest City.

**1. Viral Load is the difference between life and death.**

The initial dose of a virus and the amount of a virus a prisoner has at any one time might worsen the severity of the COVID-19 disease. Viral load is a measure of the number of particles present in an individual. Higher SARS-COV-2 viral loads might worsen outcomes. Data suggests viral load is higher in patients with more severe disease progression.

The amount of virus exposure at the start of the infection, the infectious dose, may increase the severity of the illness and is also linked to a higher viral load. In other words, viral dose escalates with exposure time. Reducing the frequency and intensity of exposure to COVID-19 reduces the infectious dose and results in a less severe case of infection. But medical evidence suggests an association of viral dose with the severity of the disease in the prison's communal setting. This association defines mortality of each prisoner's ability to either shed or succumb to the virus' effect.

At Gonzalez' prison, FCIFC attempts to alleviate population pressures by combining known infected prisoners while grouping untested unconfirmed prisoners separately. This is an extremely dangerous practice because asymptomatic prisoners have reduced levels of T-cells (lymphocytes that fight infections) but placing them together creates an increase in viral load exposure to each other-resulting in an overactivation of inflammatory responses that potentially exacerbates problems caused by the initial viral infection.

This means that in small doses and within healthy populations, prisoner's immune systems can mount an attack on the invasion, likely using innate and effective antiviral defenses. In effect, the virus is maintained in a low "viral load" state, barred from building up its infectious and pathogenicity in the host prisoner. But under the prison's regime, the viral symptoms can

rapidly progress from asymptomatic to severely symptomatic, resulting in overactive immune responses and "Cytokine Storms" where immune signaling molecules are released at high levels and immune activity becomes poorly regulated within the body.  (Pedersen and Ho (2020) SARS-COV-2: A Storm is Raging-The Journal of Clinical Investigation, 130(5)).

Simulation models to this study showed that the infectious dose was related to the number of simultaneous contacts a susceptible person has with infectious ones, including contact with severe cases and over-crowded places, which are ideal environments to be exposed to very high infectious doses.

The bottom line is higher SARS-COV-2 viral loads worsen outcomes and the current prison setting at FCIFC matches the worst-case setting.  The amount of virus exposure at the start of the infection (The infectious dose) may increase the severity of the illness when it is linked with a higher viral load.  Reducing the frequency and intensity of exposure from communal prison settings reduces the infectious doses resulting in less severe cases.

The link between the initial dose and the subsequent severity of the disease was seen with the 1918-19 Spanish Flu pandemic.  (i.e. the number of simultaneous contacts a susceptible person has with the infectious ones; that severe cases of influenza result from higher infectious doses of the virus; and over-crowded places are ideal environments for exposure to very high infectious doses resulting in high mortality due to viral overload.

COVID-19 is a fulminant disease transmitted by bioaerosol, moisture droplet, and direct contact from the infected prisoner hosts.  Viral load is exponentially possible by rebreathing one's own, same self-dosing particles back into the lungs thus promoting worse infections.  Constant mask wearing facilitates rebreathing of bioaerosol and serves to amplify the infection.

Staying close to a window or out on the porch alone without a mask is the best way to self-quarantine and ride-out the virus.  (Peter A. McCullough, M.D., MPH, Vice Chair of Medicine at Baylor University Medical Center and Professor of Medicine at Texas A & M college of Medicine in Dallas).  The prison's policy of constant mask wearing may serve to slow one source of exposure to others but creates a sure practice of a prisoner's self-destructive viral overload.

Confining positive-case prisoners together is a practice of 'herd-immunity.'  But there is no such thing as herd-immunity because COVID-19 has many strains and mutations, can repeatedly infect populations, and has multiple techniques for avoiding recognition by the immune system.  (//nextstrain.org/ and /gisaid.org/epifluapplications/next-hcov-19-app).  FCIFC is actively executing its population of prisoners under the guise of its quarantine practices.

## III.  The heightened extraordinary and compelling reasons present at FCI Forrest City warrant this court's intervention.

While other prisons have collected many dozens of recent cases granting compassionate release, the take-away is that the COVID-19 pandemic creates an extraordinary and compelling reason for RIS for those put at greatest risk of death from COVID-19.  (Sentencing Law and Policy, Another robust week for COVID-influenced federal sentence reductions using 3582(c)(1)(A).  May 8, 2020).

While Gonzalez anticipates that the government will argue that the situation within the BOP is no more perilous than it is among the public, the national data for BOP facilities refutes this contention.  As of May 2020, the BOP is reporting 3,082 federal inmates currently have confirmed positive tests for COVID-19.  (Federal Bureau of Prisons, COVID-19 at

BOP.gov/coronavirus last visited May 9, 2020). This number does not include the 619 federal inmates the BOP reports as having recovered or the 45 federal inmates who have died from COVID-19 while in custody. (Id.) The growth of confirmed cases within the BOP, in one month, has been staggering and continues to increase daily.

Comparing the growth of COVID-19 cases within the BOP against the number of cases among the United States population shows that, since the BOP's first reported infection, there has been a disproportionately high growth rate for COVID-19 cases in the BOP. The BOP itself uses a carefully crafted definition of COVID-19 results based on counting only those who test positive. The total number of open, positive lab-test, COVID-19 cases fluctuates up and down as new cases are added and resolved cases are removed. So, the number is only active cases and does not include those with symptoms, who have not been tested but are presumed sick enough to be quarantined, nor does the prison report a cumulative total number of inmates who are and have been infected.

Looking at Forrest City Low, specifically, the data shows an even more terrifying picture. In just the past week, Forrest City has seen a dramatic rise in the number of positive COVID-19 cases. (Id. at BOP.gov/coronavirus/ last visited // April 19, 2020, as inmates reportedly recovered). From May 1 to 2, the number of cases nearly doubled from 38 to 66. It has since climbed exponentially, to 243 as of May 8, 2020. In one week, the number of positive COVID-19 cases at Forrest City increased about six-fold. Those figures do not accurately reflect the illness and potential problems associated with the deadly virus spread within the prison, which number of total infected now soar over 1000 at FCIFC.

News reports indicate that inmates report a Mad-Max style, Post-Apocalyptic environment in Forrest City. (See Mad-Max Exhibit; also, Paige Cushman KATV ABC7 'It's

13

like Mad-Max in here' (April 15, 2020). Symptomatic inmates are taken for testing and then returned to the general housing area before the test results are in, permitting the further spread of the virus. The CDC has visited the prison, setting up tents to house inmates who are sick. A wood shop in the facility has been converted into a makeshift hospital to house additional sick inmates. There is little ability for healthy inmates to socially distance. Inmates sleep close together, share empty soap dispensers, and use broken toilets and faulty sinks in moldy environments. (Id. Mad-Max video).

The government may try to argue that Gonzalez, like any person, would still be at risk on the outside, but that argument overlooks the heightened risk to him on the inside. While COVID-19 is deadly wherever one encounters it, the risks of contracting it are significantly higher in the custody of the BOP and the viral load susceptibility is enhanced by an inability to avoid the communal setting. This is because the ability to quarantine or socially distance oneself from other cannot happen in prison. Indeed, the CDC's website seemingly recognizes this when it says, in response to the question "Do I have a greater chance of getting COVID-19?": "People in correctional and detention facilities are at greater risk for illnesses, such as COVID-19 because of the close living arrangements with other people." (CDC FAQ's for administrators, staff, people who are incarcerated, and families. (updated Apr. 10, 2020)), or, as on District Judge has put it, in the context of granting a motion for compassionate release, prisons are "tinderboxes for infectious disease." United States v. Rodriquez no. 2:03-CR-271 dkt. 135 E.D. Pa. Apr. 1, 2020).

Also, the higher risks to prisoners at FCI-FC are also due to the fact that the BOP appears to be ill-equipped or unprepared for this pandemic. Take the allegations made by the union for BOP's employees, which reports in a grievance that the BOP has failed to initiate a lockdown of

14

inmates fast enough to limit the spread of COVID-19.  (formal grievance, BOP, filed by Council

of Prison Locals (CPL) C-33, April 16, 2020).  The grievance reports that the BOP also "ordered

staff who have knowingly been exposed to the COVID-19 virus to report to work without the

required 14-day quarantine time recommended by the CDC...and without requiring/issuing

proper PPE increasing the risk of further exposure, illness, and possible death to other staff and

communities.  (Id.).

Or consider that a review at one BOP facility (MDC Brooklyn) found that the facility was

"Ill-equipped to identify cases of COVID-19," not implementing "adequate infection control

practices," and in this way was "actually promot[ing] a more rapid spread of COVID-19 inside

the facility and served to work against some of the infection control measures already in place.

(Facility evaluation: MDC COVID-19 response, Chunn et al v. Edge, no. 1:20-CR-10509 RPK-

RLM E.D.N.Y. April 30, 2020 dkt. no. 72-1).  (This is a facility where the BOP is currently

reporting that there are no positive COVID-19 cases, although it is in the heart of New York

City, which has the nation's most significant outbreak.  (FBOP, COVID-19, May 9, 2020).  It

would not be surprising if an evaluation of Forrest City found similar conditions.

Also, the rates of infection at other BOP facilities, like the rates at Forrest City Low, are

staggering.  At Lompoc, over two-thirds, 792 of the 1162 inmates, are reported to have tested

positive for COVID-19.  (Compare FBOP, COVID-19, (BOP.gov/coronavirus/May 9, 2020).  At

Terminal Island FCI, 61.8% of the 1042 inmates are reported to have tested positive.  (Id.

compare May 9, 2020).  No matter how well-meaning the BOP's officials, this data does not

indicate a "well controlled" or "effective effort" by the BOP.

**Section 3553(a) factors**

Gonzalez has accomplished a wide span of positive activities during his time with the Bureau of Prisons. He has taken most every class available to him. He has taught classes in Art, Technical Writing, and has served his inner community as a law clerk. He has also volunteered as a peer-crisis counselor in suicide prevention. His good works have earned him a reduction in his custody classification level to a "low" prison custody facility where he has served for the past 5 years. His PATTERN score rating places him in the "Minimum" category for recidivism (the lowest possible rating for any prisoner) and as "Eligible" for sentence reductions made available under the provisions and opportunities offered under the FIRST STEP ACT. Gonzalez' PATTERN score sheet, provided by his Case Manager-Brazile, was previously included as an Exhibit for this court's review.

As mentioned in Gonzalez' previous motion, he has held an exemplary record of education and programming activities during his time in incarceration. While those 3553(a) considerations may not have changed, the expected conditions of Gonzalez' confinement, with the ongoing COVID-19 pandemic, have changed. Factoring the COVID-19 pandemic and the grave risk to him from the Coronavirus in Forrest City Low, the 3553(a) calculation warrants a need for a significant reduction or change in his sentence, or other appropriate remedy, such as enlargement and use or provisional remedies available to this court. (Exhibit 4, as presented in a parallel proceeding on the same issue).

Gonzalez includes an extensive home plan, which was filed with his prison's Warden, for this court's review. Gonzalez has received an employment offer as a paralegal, effective immediately upon reassignment under the court's custody, which requires that he only telecommute via electronic communications while remaining confined at home. (Exhibits 5).

## IV.  Conclusion

Gonzalez asks for an opportunity to continue to live.  This petition is not a request for a get-out-of-jail-free pass, nor is this request made to mechanically circumvent the punishment already imposed.  On the contrary, Gonzalez asks to be incarcerated under this court's supervision and authority-with full application of its rules, restrictions, and supervisory mandates.  Even if this means receiving no time-credit for this electronic-monitoring period. Gonzalez' best interests in exoneration exist in his future litigation with this court.  But the present communal prison environment and lack of medical treatment threaten the future existence of all of the above.

The fact that the crimes alleged are more than 15 years old, coupled with the certainty that Gonzalez no longer serves as a State official, effectively eliminates any possibility for recidivism, especially when coupled with this court's prospectively ordered supervision and video home monitoring of Gonzalez' activities while under court custody.

Gonzalez asks to be treated consistent with the 8th Amendment of the United States Constitution and by the United Nation's standard minimum rules for the treatment of prisoners which provide that prisoners should enjoy equal standards of health care that are available in the community, and should have access to necessary health-care services free of charge without discrimination on the grounds of their legal status.  Gonzalez prays this court find merit in the issues presented and finds that its intervention is necessary to serve the interests of justice in accord with these precepts and grants him protection under the authority and custodianship of this court.

## VERIFICATION

I have read the foregoing Reply to Government's Response and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct. Executed at Forrest City, Arkansas on this 8th day of July 2020.

Gabriel Gonzalez #30515-112
Petitioner, Pro Se

## CERTIFICATE OF SERVICE

I certify under the penalty of perjury that the foregoing Reply to Government's Response was placed in the prison's internal mail system, postage pre-paid, for service upon this Court via U.S. mail on this 8th day of July 2020 to Court Clerk at 312 N. Spring Street Los Angeles, California 90012. The Defendant asks this Court's Clerk to serve all other interested parties by electronic notification.

Gabriel Gonzalez #30515-112
Petitioner, Pro Se
P.O. Box 9000—Low
Forrest City, Arkansas 72336



FOLD HERE

U.S. POSTAGE
$1.60
FCM LG ENV
75905 0000
Date of sale
07/08/20
06    25P
11487204

SHREVEPORT LA. 711
WED 08 JUL 2020 PM

CAS

RECEIVED
CLERK, U.S. DISTRICT COURT

JUL  3 2020

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

...riel
Forrest City - Low
Box 9000
...est City, Arkansas
72336

United States District Court Clerk
Central District of California
312 N. Spring Street
Los Angeles, California
90012