FILED
August 24, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_CMJ\_\_\_ DEPUTY

United States District Court
Central District of California

United States of America
Plaintiff

v.

Gabriel Gonzalez
Defendant, Pro Se

Case Number
CR-04-1189(A)-CAS

Supplement to Defendant's Reply Motion

Gabriel Gonzalez asks this honorable court to accept this supplement meant to address, in part, the declaration of Associate Warden Dr. Hall which was previously submitted by the government but which was only recently served upon the defendant. This supplement is made to address important points and facts relevant to the issues in the above matter.

I. **The government's 'Declaration of Dr. Hall'-exhibit favors granting relief.**

The 5/12/20 Declaration of Dr. Hall-exhibit submitted in the case of United States v. Gibson 4:12-CR-600 S.D. Tex. (5th Cir.) sets forth a discussion of the dangerous COVID-19 condition in the federal prison system, the steps which authorize the BOP to place inmates on home confinement (distinct from compassionate release), and the need to protect all prisoners from contracting the Coronavirus.

Associate Warden Hall states that a surge at the [FCI Forrest City] site has prompted the BOP to immediately review all inmates with risk factors for priority home confinement consideration. (Hall declaration doc. 212 p.8, para. 3). Hall also indicates that despite qualification for home confinement:

"The BOP will not grant home confinement to inmates when doing so

is likely to increase their risk of contracting COVID-19. The BOP will grant home confinement only when it has determined--based on the totality of circumstances for each individual inmate--that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." (Id. p.9, para. 6).

Of significance is Hall's assertion that it is the "increased risk of contracting COVID-19" that is the priority and goal of this measure. Since it is undisputed that the (1) Coronavirus is a deadly, contagious disease, (2) for which there is no cure, and (3) whose contagious impact is increased and exacerbated in the prisons' communal setting without means for avoidance there can be little doubt that it is the Coronavirus, not one's preexisting medical conditions, that is the true nature and concern of all involved. While it is true that some medical condition(s) heighten the dangers of contracting COVID-19, it is equally perilous to expose prisoners to enhanced risk through environmental and situational factors which exacerbate that risk.

The fact that FCI Forrest City is a low-security facility, with open-dorm living quarters and communal amenities, it is apparent that FCI-FC was not meant, nor is able, to prevent or contain such conditions as this outbreak. The dangers, hazards, and risks at this prison serve to heighten a "likely increased risk of contracting COVID-19." It is only worsened by compounded exposure under these conditions, once a prisoner has contracted the virus, that he shall remain ill due to the overwhelming degenerative effects and morbidity of the virus or by reinfection after the slim chance a prisoner may somehow recover on his own.

These points set the stage for Hall's assertions and show that justification for retaining prisoners under these exposure-conducive conditions is futile at best and criminally wreckless at worse. The BOP, by and through Hall's declarative statement, supports this point. Any other reason or pretext which prevents or excuses the safegarding of prisoner health and safety in this way flies in the face

of our Constitution and laws and alters the method of confinement under the auspices of executive legislation. This court's intercession is necessary to prevent the impending ultimate harms because if nothing is done, the disease surely will not abate itself.

The Gibson court, for whom Hall created this declaration, has recommended a 2-year furlough for Gibson III and Gibson IV in lieu of granting RIS, thus demonstrating the necessity and existence of options available to counteract the morbidity of the virus and the rigidity of sentencing enforcement under this novel circumstance.

## II. Hall's declaration is general as to BOP directives but is not specific as to Forrest City's adoption of those directives.

Hall's declaration specifies that attention has been prioritized to FCI Oakdale, FCI Danbury, and FCI Elkton. (Id. p.11, para. 9). Despite the fact that FCI Forrest City has sustained infection to approximately 2/3 of its population it is clear that the BOP has not 'move[d] with dispatch' as Hall has indicated.

Hall indicates FCI-FC evaluates each prisoner based upon criterion unrelated to the risks inherent at the prison, but rather which focus on factors related to the prisoner's conviction and rehabilitation while in prison, such as his security level and PATTERN score. (Id. p.13, para. 18). But Hall admits these 'priority' factors are 'subject to deviation...' as the 'situation progresses.'

Hall's declaration sets forth a 'wish list' of activities and precautions with BOP protocols and CDC guidance at FCI-FC low. (Id. pgs. 16-18). These safeguards, while virtually effective and defensive from the virus, are actually tenuous and insubstantial because they are either not followed or implemented at all, or are activities meant to promote the CDC's study of the spread of the virus-not the containment or treatment of its effects. (compare Id. p.17, para. 28 to p.18, para. 31). These virtual safeguards are further addressed in the attached Statement and Declaration

(Exhibit 1); (see also Mad-Max video previously submitted).

The conditions and method of imprisonment at Forrest City low remain dire. Soon, the facility will reach full infection capacity. The BOP's misreporting of its cumulative-infected numbers, its monthly changing of PATTERN scoring and other criterion serve only as a moving target for which no one can discern with certainty its formula, and its regime of nonprovisional Xray, MRI exams, or any other meaningful tests or treatments for its infected is a lethal combination intentionally hidden from a court's cursory review.

Dozens of courts in nearly every Circuit have found dangerous circumstances at FCI-FC and have granted compassionate release. Even Gibson's court issued a 'Strongly Recommend[ed]' decision to FCI-FC favoring a 24 month furlough for both defendants under Forrest City's custodianship. (see Gibson 4:12-CR-600 S.D. Tex, Houston Div.). This petitioner asks this court find good cause for granting him relief based upon these facts.

### III. Relief is available under 18 U.S.C. § 3582.

The main issue brought before this honorable court is sought to modify the method of imprisonment against this defendant and not, necessarily, the term of imprisonment. As such, this request is made to be construed liberally under this separate form of relief.

(a) Before the FIRST STEP ACT's amendments to § 3582, the BOP was the sole arbiter of determining qualification for any "extraordinary and compelling" reasons, and only the BOP could bring a motion for a reduction of sentence under § 3582(c)(1)(A). Under the newly amended § 3582(c)(1)(A), post-FSA, the court may now thus:

> "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the

unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--(i) extraordinary and compelling reasons warrant such a reduction...and that such a reduction is consistent with applicable policy statements issued by the sentencing commission."

This post-FSA amendment expanded the court's, as opposed to the Director of the BOP, power to find extraordinary and compelling reasons other than, or in combination with, the three explicitly defined reasons in the U.S. Sentencing Guidelines manual § 1B1.13 cmt. n.1(A)(C).

In other words, defendants no longer need the blessing of the BOP to bring such motions, and in fact, it is not necessary that the BOP may ever weigh in or provide guidance when a § 3582(c) motion is brought by a defendant. See DeLuca v. Lariva 586 F.App'x 239, 241 (7th Cir., 2014)("While the BOP's interpretive program statement lists some factors the Bureau may consider in determining whether to move for compassionate release, that list is non-exhaustive.").

Given the changes to the statute, the policy statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the original statute and thus does not comply with the Congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

In sum, this makes clear that if the Director of the BOP were still the sole determiner of what constitutes an extraordinary and compelling reason, the Amendment's allowance of a defendant's own § 3582(c)(1)(A) motion for reduction of sentence would be to no avail. In fact, such a reading would contravene the explicit purpose of the new amendments. (United States v. Cantu 423 F.Supp. 3d 345 (2019).

(b) This court is asked to find reason to provide relief in this case because this prison, separate and distinct from the BOP itself, has proven itself unable to contain the virus, unable to protect those in its custody from its harmful effects,

unwilling to administer meaningful, minimal testing and treatment for its infected and presymptomatic prisoners, and for reasons requiring this court's intervention to restore the original 'method' of incarceration by statute. This included confinement under conditions free of contagious hazards whether those hazards pose immediate or future injuries not contemplated by the legislature's original meaning of 'imprisonment.' But, continued imprisonment here is beyond what is useful, customary, regular, or common and is imposing irreparable harm to its prisoners and creating an injustice irreconcilable with the terms of the defendant's original sentence.

The objective sought by this motion accounts for the seriousness of the original sentence without imposing a de facto life sentence. A court ordered term, up to and including the entire term originally imposed, can and is justified under a court-ordered term of supervised release where the ability to quarantine and receive treatment for medical conditions can be received. Deterrence is satisfied in this case because it is not the length of the punishment that is important in terms of deterrent value, but the certainty of punishment. This conviction and certainty of punishment has been met. But allowing the method to be more severe than that which is allowable would certainly foster an affront to the goals sought in advancing respect for our laws. The method of imprisonment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. Otherwise, the physical mistreatment and primitive torture inherent under further Coronavirus exposure would certainly provoke transgressive punishment barred by the 8th Amendment and would offend the cardinal principles for which the Constitution stands.

## Conclusion

The BOP currently reports 3,861 prisoners and 318 staff have active cases of Coronavirus. These totals, however, do not reflect the cumulative number of infected persons from federal prisons. There are 105 BOP and private federal prisons

and 46 halfway houses that are overrun by COVID-19.  101 inmates have died from complication of this contagion while under BOP care.  These figures demonstrate that the virus is beyond containment by the BOP and current prison efforts to protect inmates are inadequate and injurious.

The most current research on COVID-19 describes findings as, "We identified a higher than expected number of people with neurological conditions such as brain inflammation, delirium, nerve damage, and stroke.  (Univ. Coll. of London Research; also Michael Zandi of U.C.L.'s Queen Square Institute of Neurology).  This research makes clear that cardiovascular, respiratory, and neurological imaging is necessary in the examination and treatment of the Coronavirus.  (Prof. Marc Dweck, Univ. of Edinburg Cardiologist- "Tests have shown severe dysfunction linked to even mild virus infections." (study July 8, 2020)).  No such tests are offered nor available through the BOP.

Relief granted from this court will enable Gonzalez to obtain such necessary care.  For this reason and those stated previously, Gonzalez prays this court recognize these harmful conditions and order RIS, or issue a recommendation to the BOP that he be placed on home confinement or furlough in this matter.

## Verification

I have read the foregoing Supplement to Defendant's Reply Motion and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct.  Executed at Forrest City, Arkansas on this 19th day of July, 2020.

Gabriel Gonzalez
Defendant, Pro Se

Certificate of Service

I certify under the penalty of perjury that the foregoing Supplement to Defendant's Reply Motion was placed in the prison's internal mail system, postage pre-paid, for service upon this court via U.S. mail on this 19th day of July, 2020 to 312 N. Spring Street Los Angeles, California 90022. Gonzalez asks this court's clerk to provide him with a stamped and filed copy of this motion and to serve all other interested parties by electronic notification.

Gabriel Gonzalez
Defendant, Pro Se