**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff-Appellee,*<br>    v.<br>GABRIEL GONZALEZ,<br>    *Defendant-Appellant.* | No. 06-50461<br>D.C. No.<br>CR-04-01189-<br>CAS-1<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
May 9, 2008—Pasadena, California

Filed July 18, 2008

Before: John T. Noonan, William A. Fletcher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Noonan

**COUNSEL**

Eric S. Multaup, Mill Valley, California, for the defendant-appellant.

Nathanial Pollack, Washington, D.C., for the plaintiff-appellee.

**OPINION**

NOONAN, Circuit Judge:

Gabriel Gonzalez was convicted of acting under color of law to deprive three women of their right to bodily integrity in violation of 18 U.S.C. § 242. He appeals, alleging error in the admission of evidence. Finding no fatally harmful error, we affirm the judgment of conviction.

**FACTS**

We state the facts presented by the government's witnesses:

According to Cecilia Tirado, the owner of a beauty shop, she was driving home alone on the Imperial Highway after having been dancing at Alpine Village. The date was a Sunday in July or August 2002. The time was early morning. She

was pulled over by someone in a patrol car dressed as a policeman and carrying a gun.

The officer performed sobriety tests on her, then ordered her into the patrol car. He drove her by her home in the City of Southgate but passed the house without letting her out. While driving, he asked her whether she had a husband or boyfriend. After a long drive, the officer drove into a desolate parking lot, commanded her to undress and penetrated her vagina. He then drove her back to her car and left her.

According to Pamela Fields, a prostitute, she was walking in the center of Long Beach Boulevard late at night on January 8, 2003 when a black and white police car, marked "Sheriff," stopped her, and the officer asked her for identification, then asked her to get into the car. He drove around and stopped in a nearby alley, examined her genital area and displayed his own sexual organ. He requested her to engage in oral sex, and she complied. He eventually let her go.

According to Kussy Guzman, a native of Peru, she was driving home alone from her work as a shift leader at Jack-In-The-Box at about 2:00 a.m. in the last days of 2002. She was pulled over by a police officer, who questioned her and eventually told her to sit on the street. The officer asked her whether she had a mother, a sister, or a boyfriend. Purportedly in search of a weapon or drugs, he touched her hips, waist and breasts. He then let her go.

According to Shirley Munoz, an assembler at a manufacturing plant, she was driving alone to her hotel in the early morning hours of November 16, 2001. She was pulled over by a sheriff's deputy. She admitted to him that she was on parole. He examined her, made her partially undress, and put his hand on her breasts. The officer twice told her that she was pretty, and asked if she was married before eventually releasing her.

According to Elizabeth Castillo-Chavez, a married resident of Compton, she was pulled over by a Compton Sheriff's dep-

uty on her way to work at about 5:00 a.m., near the end of December 2001. The officer ordered her into the back of his police car where he placed himself next to her and asked her personal questions. He told her to get out of the car and searched her, rubbing his palms on her thighs, hips and breasts.

The principal issue at trial was the identity of the perpetrator. The process of identification began when Fields, the night she escaped from the officer, encountered her husband Rory Fitzhugh, against whom she had a restraining order. A police car noticed them, and she told the officers of her recent ordeal. She furnished the number of the patrol car of the officer who had tormented her and also the license plate she had memorized — respectively 050 or 650 and 300795 or 000795. An investigator learned that 050 was on the roof of a sheriff's vehicle used by two deputies on the day shift on January 8 and not used that night. The number on the defendant's patrol car was 560. The license plate on his car was E1007975.

Despite these discrepancies, the investigation continued. The investigator brought a "photo-six-pack" (a group of six similar-looking persons) and showed it to Fields the day after her ordeal. She identified the defendant as the perpetrator. The investigator then had an examination made of the patrol car used by the defendant on the night of January 8. A fingerprint matching Fields' was found on the trunk of the car.

The investigation of the Fields case interacted with the Tirado case, when in January 2003 Tirado responded to a telephone survey by the Southgate police asking about citizen satisfaction with police activities. She told her story, and a Southgate police officer called on her at home to confirm it, later notifying the Los Angeles Sheriff's internal complaint bureau. An investigator there spoke to the investigator of the Fields case.

Tirado had identified the perpetrator as a Southgate police officer. But on February 19, 2003, when Tirado was shown a

photo-six-pack she was visibly upset and at once identified the defendant as the perpetrator. She also showed investigators where she'd been pulled over on the night of the attack; it was an area patrolled by the Los Angeles Sheriff's Department.

The FBI, alerted by the investigators, searched the records of the defendant's onboard computer. The names of Guzman, Munoz, and Chavez turned up. The FBI sent letters to each of the three women asking if they had encountered "a police officer" whose conduct had been improper. This inquiry led each of the women to report the incidents set out above. Guzman then identified the defendant from an FBI photo-six-pack.

## PROCEEDINGS

Gonzalez was indicted on August 25, 2004. Count One of the indictment alleged the rape of Tirado as above narrated. Count Two alleged the fondling of Guzman. Count Three alleged the oral sex required of Fields. In addition, the government offered the statements of Castillo and Munoz to show a pattern of conduct by the defendant.

After a trial by jury Gonzalez was convicted on all three counts. He was sentenced to thirty years' imprisonment and five years' supervised release.

Gonzalez appeals.

## ANALYSIS

Gonzalez's appeal rests in challenges to the admissibility of some of the evidence used against him. He earnestly contends that there were individual mistakes by the court that justify reversal and that cumulatively the errors require reversal. Our review asks if the district court abused its discretion and if its errors, if any, were more likely than not to affect the verdict.

*United States v. Chu Kong Yin*, 935 F.2d 990, 994 (9th Cir. 1991). We consider each contention of the defendant in turn.

**[1]** The framework for decision of the hearsay objections is set by Fed. R. Evid. 801(d)(1)(B) and its exposition in *Tome v. United States*, 513 U.S. 150 (1995). Rule 801 provides:

> (d) Statements which are not hearsay. A statement is not hearsay if —
>
> (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

As statements meeting these conditions are not hearsay, they go beyond rebuttal of attack on the declarant and constitute substantive evidence in the case. *Tome*, 513 U.S. at 157. The statement may not be admitted "to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Id*. The Rule "speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Id*. at 158. This limitation reinforces the requirement that the consistent statements "must have been made before the alleged influence, or motive to fabricate, arose." *Id*. "A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive." *Id*.

*The Retelling of Tirado's Story*. The defense argues that Tirado's testimony, delivered by her in Spanish through an interpreter, was improperly and prejudicially bolstered by the government calling as a witness Sergeant Enrique Garza, the police officer who interviewed her and who at trial retold the story of the assault as she had told it to him. This retelling in

English with the stamp of official acceptance of what Tirado had already testified to must be considered, the defense maintains, a violation of Rule 801(d)(1).

**[2]** Measured by this measure, the retelling of Tirado's story by Garza was inadmissible hearsay. It was not offered to rebut "an express or implied charge of . . . recent fabrication or improper influence or motive" on Tirado's part. References by the defense in its cross-examination of Tirado to her suit against Gonzalez and the County of Los Angeles were made to bring out discrepancies in the dates to which she testified. True, a faint implication could have been drawn that this lawsuit motivated her present testimony; but "[a] party will often counter [hostile testimony] with at least an implicit charge that the witness has been under some influence or motive to fabricate." *Tome*, 513 U.S. at 162 (Kennedy, J., for plurality). Rule 801(d)(1)(B) should not be read to open "the floodgates" to any prior consistent statement. *Id*. To conclude that the cross-examination of Tirado opened the door to Sergeant Garza's retelling of her story would remove the restraint on prior consistent statements that Rule 801(d)(1)(B) imposes. The district court erred in admitting it.

**[3]** Was admission of this hearsay prejudicial? Was it sufficiently prejudicial that it more likely than not affected the verdict? Tirado's account of the rape not being at issue, it is difficult to see what Garza's retelling of it added to the prosecution's case except for its spillover effect: Tirado was confirmed as credible by a police officer. A kind of vouching was furnished for all her testimony, including the eventual identification. That effect of this inadmissible hearsay was prejudicial to the defendant.

**[4]** The second question is harder. As the Supreme Court has sententiously observed, persons are entitled to fair trials, not perfect ones. *Ross v. Oklahoma*, 487 U.S. 81, 91 (1988). A jury that believed that Tirado had had the awful experience — and no one doubted that she had — would very probably

have believed that she could remember her assailant, even without the hearsay from Garza. Tirado stated at the time of her identification that she was "100 percent sure" that Gonzalez had raped her. Given this testimony, it is unlikely that any generalized vouching regarding Tirado's credibility altered the jury's verdict.

[5] *The Retelling of Fields' Story*. Clarissa McClung, a registered nurse and sexual examiner, examined Fields at the hospital the night of the assault. McClung testified that the victim's description of the assault affects the examination she conducts. She examined Fields' mouth for injury. Fields told her that "she had been forced to have oral copulation." This hearsay, objected to by the defense, was properly admitted under Fed. R. Evid. 803(4) as a statement "made for purposes of medical diagnosis or treatment." True, she was collecting evidence, but that forensic function did not obliterate her role as a nurse, in a hospital, performing a medical examination of a victim of a sexual assault. It would have been unprofessional for McClung to have treated Fields without eliciting an account of what had happened to her. We conclude that the district court did not abuse its discretion in admitting McClung's statement under Rule 803(4).

The defense also objected to a retelling of Fields' story by Sergeant James Kagy, the police officer who interrogated her approximately three hours after the event. Again, the objection is to what is characterized as hearsay, but it appears to us to have been proper rebuttal.

The defense had cross-examined Fields as follows:

  Mr. Hirsch: Ms. Fields, you have before you the exhibit?

  Ms. Fields: Yes, sir, I do.

| United States v. Gonzalez | 8937 |
|---|---|

Mr. Hirsch: And is this the complaint that you have for damages against the County of Los Angeles and the defendant in this case?

Ms. Fields: I actually haven't even read it yet . . . .

* * *

Mr. Hirsch: You have an attorney, Mr. Gregory Yates, who filed a lawsuit on your behalf?

Ms. Fields: Yes, I do, sir.

Mr. Hirsch: And you understand that lawsuit is pending in the federal district court somewhere in this building?

Ms. Fields: I'm not sure.

Mr. Hirsch: And you understand the lawsuit is against the County of Los Angeles, Leroy Baca and Gabriel Gonzalez; isn't that right?

Ms. Fields: I'm not aware of everything fully, but I know there's a lawsuit.

Mr. Hirsch: And you are seeking damages as a result of this lawsuit, are you not?

Ms. Fields: Yes, sir.

* * *

Mr. Hirsch: And after the indictment was returned, then your attorney filed the lawsuit; is that correct?

Ms. Fields: No. During that time, Ronald Mintz picked up the case for me and had done some filings for me here in L.A.

8938          United States v. Gonzalez

    Mr. Hirsch: Well, but did you tell Agent Riedel that you contacted an attorney, and since you didn't know the name of the deputy, the attorney would not take the case?

    Ms. Fields: That's right.

    Mr. Hirsch: And after the story was publicized, and the deputy had been indicted, then your attorney filed the paperwork?

    Ms. Fields: Yes. But during that time frame, there was another attorney that helped me. His name was Ronald Mintz.

    **[6]** The thrust of this cross-examination suggested that Fields had a money motive to lie about Gonzalez's conduct. Unlike the cross-examination of Tirado, the references to the pending civil case were not incidental. They were made to suggest a mercenary purpose. The officer's account of her story was properly admissible rebuttal under Rule 801(d)(1)(B).

    The defense claims that Fields already had a motive to lie to the officer in the hospital — to avoid arrest for prostitution and to keep her husband out of trouble for violating a restraining order prohibiting him from being with her. The defense argues that the court erroneously prevented it from presenting the restraining order to explain Fields' concern. It adds that her young children were stowed at a motel; if Fitzhugh were arrested for violating the order and if she were arrested for prostitution, the children would have been abandoned; hence, she quickly made up the story about Gonzalez to distract attention from herself and her husband. The defense notes that her testimony that she "flagged down" the officers who helped her is contradicted by their testimony that they took the initiative in making contact with her.

UNITED STATES v. GONZALEZ　　　　8939

**[7]** The existence of the motives attributed to Fields does not disqualify her statement to Kagy as appropriate rebuttal of the implicit charge of fabricating her story in order to pursue the civil suit. If the defense had been allowed to develop the facts on the restraining order, it might have appeared that Fields conceivably had a motive to distract police attention from Fitzhugh. But that motive was slight compared to her own motive to keep from arrest as a prostitute, and this motive was already presented to the jury when her occupation became clear to them on direct examination. The jury knew she had a motive to lie and that her claim to have asked the officers for help was contradicted by them. The additional information about Fitzhugh would have added little to the jury's assessment of her credibility. The court's limitation on cross-examination of Fields on the terms of the restraining order sensibly saved time and confusion and did not violate Gonzalez's right to confront the witnesses against him. *See United States v. Munoz*, 233 F.3d 1117, 1134 (9th Cir. 2000); *see also* Fed. R. Evid. 403.

**[8]** *The uncharged conduct*. The acts involving Castillo and Munoz were testified to, over objection, as admissible under Fed. R. Evid. 404(b). The court found that there was sufficient evidence for the jury to find that Gonzalez had committed the acts; that the acts were not too remote in time from the crimes charged; that there were sufficient similarities between the acts and the crimes charged; that the probative value of the evidence outweighed the danger of unfair prejudice; and that evidence of the acts was extremely probative of identity and modus operandi.

The defense points to differences. Gonzalez ran a computer check on Castillo and Munoz, not on Fields or Tirado. The computer check on Guzman was a month after the date she said the incident occurred. The acts committed on Castillo and Munoz were different from those committed on Fields, Guzman and Tirado. Fields was not in a car but on foot. There was no "signature" by the defendant.

8940   United States v. Gonzalez

**[9]** Rule 404(b) prohibits the use of other crimes or wrongs to prove character or criminal propensity. To draw the line between acts constituting such excluded evidence and acts showing identity and modus operandi is not easy but not impossible. Here modus operandi consisted in (1) being a police officer armed with a badge and a gun and the invisible aura of authority accompanying these trappings of public trust; who (2) would spot a woman alone at night; (3) would accost her; (4) would identify her as neither a minor nor a sexagenarian; (5) would attempt to establish a conversational rapport by asking her about her family and personal relationships; (6) would command her to sit, squat, stand, or undress; (7) would obtain sexual stimulation by contact with her flesh while she was in an isolated position unable to resist his commands or his hands; and (8) would release her without any arrest or citation for her supposed offense. Beyond propensity, the evidence established a way of behavior that could be reasonably relied upon by a juror to convict Gonzalez of the charged offenses.

*Conclusion.* It is not contested that the testimony of the government's witnesses, if true, established offenses by Gonzalez in violation of 18 U.S.C. § 242. Included in the liberty protected by the Fourteenth Amendment is the concept of personal bodily integrity and specifically "the right to be free from certain sexually motivated physical assaults and coerced sexual battery." *United States v. Lanier*, 520 U.S. 259, 262 (1997). The defendant has been shown to have, wilfully and under color of state law, unlawfully coerced his victims to suffer sexually-motivated assaults and batteries. We have taken note of the minor discrepancies emphasized by the defense in the witnesses' accounts. None of them are such as to shake confidence in the verdict. Their testimony was detailed, their accounts of what had been done to them effectively unchallenged, and their identification of Gonzalez as the perpetrator was confirmed by Fields' fingerprint on his patrol car; by Fields' accurate recollection of 8 of the 10 identifying numbers on Gonzalez's patrol car; by the proof of the

area he patrolled and the times he was on patrol; and by the experiences of Castillo and Munoz.

Gonzalez, thirty-seven at the time of the crimes, was a graduate of California State University at Long Beach. He had been gainfully employed since he was 26. He had no criminal record. He had been a member of the Los Angeles Sheriff's Department since 1997. To read his case is to read the story of a police officer inexplicably gone bad. His fall is great, his sentence hard. Bearing all this in mind and recalling that identifications are sometimes mistaken, we have reviewed the record and found that we cannot say that our confidence in the verdict has been shaken or that the convictions were produced by error. Accordingly, the judgment of conviction is AFIRMED.